## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) DOUGLAS W. BRANT d/b/a**<br>**BETHANY MEDICAL CLINIC,** | § <br> § <br> § | |
| **Plaintiff,** | § | |
| **vs.** | § | **CASE NO. CIV-12-656-F** |
| | § | |
| **(1) STATE FARM FIRE AND**<br>**CASUALTY COMPANY,** | § <br> § <br> § | |
| **Defendant** | § | **JURY DEMANDED** |

### DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S
### MOTION TO EXCLUDE THOMAS IRMITER AND
### BRIAN JOHNSON AS EXPERT WITNESSES

Respectfully submitted,

**JONES, ANDREWS & ORTIZ, P.C.**

By: /s/ Daniel C. Andrews
      Daniel C. Andrews, OBA #19392
21 E. Main St., Suite 101
Oklahoma City, Oklahoma  73104-2400
Telephone:   405/601-8713
Facsimile:   405/232-8330
**ATTORNEYS FOR DEFENDANT,**
**STATE FARM FIRE AND CASUALTY**
**COMPANY**

**OF COUNSEL:**
**JONES, ANDREWS & ORTIZ, P.C.**

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Argument and Authorities ................................................................................. 3

The Expert Report ............................................................................................. 4

Relevant Deadlines ........................................................................................... 5

The Irmiter/Johnson Expert Disclosures .......................................................... 6

Mr. Irmiter's List of Other Cases in Which he has Testified by Deposition or at
Trial over the Past Four Years .......................................................................... 8

The Estimate ...................................................................................................... 9

Defendant's Expert Reports ............................................................................ 10

The Core Sampling .......................................................................................... 11

The Revised Report, Revised Estimate and Revised List of Cases ................ 11

The Testimony of Tom Irmiter ........................................................................ 13

Analysis of the Reliability of the Experts' Opinions in the Original
Report and Estimate ........................................................................................ 14

The "Supplemental Report" ............................................................................ 18

Sanctions .......................................................................................................... 19

Relief Requested .............................................................................................. 21

Summary ........................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Anderson v. Caldwell County Sheriff's Office*,
    2011 WL 2418509 *1 (W.D.N.C. June 13, 2011)....................................................5

*Bitler v. A. O. Smith Corp.,*
    400 F.3d 1227, 1232 (10th Cir. 2004) .......................................................................3

*Coleman v. Dydula*,
    190 F.R.D. 316,318 (W.D.N.C. 1999) ......................................................................5

*Dyett v. North Broward Hosp. District*,
    2004 WL 53220630, *1 (S.D. Fla. Jan. 1, 2004)......................................................4

*Elgas v. Colorado Belle Corp.*,
    179 F.R.D. 296, 300 (D. Nev. 1998) ........................................................................5

*General Electric Co. v. Joiner,*
    522 U.S. 136, 146 (1997) ..........................................................................................3

*Hallmark Developers, Inc. v. Fulton County, Georgia,*
    2004 WL 5492706, *6 (N.D. Ga. September 27, 2004) ...........................................4

*Hilt v. SFC, Inc.*,
    170 F.R.D. 182, 185 (D. Kan. 1997) ........................................................................5

*Kumho Tire co., Ltd. v. Carmichael*
    526 U.S. 137, 147-49 (1999) ....................................................................................3

*Ralston v. Smith & Nephew Richards, Inc.,*
    275 F.3d 965, 970 (10th Cir. 2001) ..........................................................................3

*Sullivan v. Glock, Inc.*,
    175 F.R.D. 497, 503 (D. MD. 1997) ........................................................................5

**Rules**

Fed.R.Civ.P. 26 ....................................................................................................... 4, 19

Fed.R.Civ.P. 26(a) ............................................................................................... 2, 22, 23

Fed.R.Civ.P. 26(a)(2)(B)(v) ....................................................................................... 4

Fed.R.Civ.P. 26(e)(2) ................................................................................................. 19

Fed.R.Civ.P. 37 ...................................................................................................... 2, 23

Fed.R.Evid. 403 ........................................................................................................... 3

Fed.R.Civ.P. 37(c) ...................................................................................................... 22

Fed.R.Evid. 702 ........................................................................................................... 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **(1) DOUGLAS W. BRANT d/b/a** | § | |
| **BETHANY MEDICAL CLINIC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **vs.** | § | **CASE NO. CIV-12-656-F** |
| | § | |
| **(1) STATE FARM FIRE AND** | § | |
| **CASUALTY COMPANY,** | § | |
| | § | |
| **Defendant** | § | **JURY DEMANDED** |

**DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S**
**MOTION TO EXCLUDE THOMAS IRMITER AND**
**BRIAN JOHNSON AS EXPERT WITNESSES**

Defendant, State Farm Fire and Casualty Company ("State Farm"), files this Motion to Exclude Thomas Irmiter and Brian Johnson as expert witnesses.

## INTRODUCTION

This is a case for breach of contract and bad faith arising out of Plaintiff's claim for hail damage occurring on May 16, 2010. State Farm investigated the claim and found some hail damage to the metal surfaces on Plaintiff's medical building, located in Bethany. However, the investigation revealed no hail damage to the roof surface itself. This is a commercial building with a flat roof comprised of modified bitumen.

Irmiter and Johnson have been designated by Plaintiff to "give opinions regarding the damage to Plaintiff's insured property. Their testimony will focus on all aspects of the damage to the property." Plaintiff filed a copy of a report signed by both, and a repair

estimate which is said to be "approved by" Tom Irmiter.  They are both employees of Forensic Building Sciences, Inc., which is wholly owned by Mr. Irmiter.

State Farm seeks to exclude the testimony of Mr. Irmiter and Mr. Johnson as it is unreliable.  Per their report, neither visited the site before giving their opinions, and are attempting to give evidence of causation without actually seeing the damage.  They are not qualified to accurately determine the roofing materials and quantifies involved, as shown by errors in their report and estimate.  They base their report and estimate on incorrect assertions regarding the applicable building codes and supposed requirements for approval by engineers or architects.  The pricing in their estimate is grossly inflated and they have over scoped the loss.  The testimony is unreliable and inaccurate.  It is not based on scientific or reliable methodology, or sound, recognized principles.  This is junk science, construction style.

State Farm additionally seeks to exclude the witnesses as a sanction under Fed.R.Civ.P. 37.  The report and other information required by Rule 26(a) are incomplete and inaccurate.   More than a month after the expert report deadline, the experts performed additional testing and inspections, and have prepared a "Supplemental Report" correcting and amending the earlier report, and a revised building repair estimate which is approximately $220,000.00 more than the estimate filed with this Court in January.  The Supplemental Report and revised estimate were given to State Farm's counsel around 5:30 p.m. on Wednesday, January 27, just 14 ½ hours before Mr. Irmiter's deposition.  In addition to striking the witnesses, State Farm seeks a monetary sanction for attorneys fees and costs associated with Mr. Irmiter's deposition and this Motion.

f:\dca\214-443\motion exclude irmiter & johnson.022513.doc

## ARGUMENT AND AUTHORITIES

Under Rule 702 of the Federal Rules of Evidence, a proposed expert with the necessary knowledge, training, and experience, can testify as an expert "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." It is the trial judge's role as a gatekeeper to ensure that all expert testimony is not only relevant, but reliable. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). This function applies to all expert testimony, not merely that due to be "scientific" in nature. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999). The burden of demonstrating the admissibility of expert testimony, as against the standards of Rule 702, is on the proponent of the testimony. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). Opinion evidence is not reliable when it is connected to the existing data "only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

It should also be noted that under Fed. R. Evid. 702, testimony must "assist the trier of fact to understand the evidence or determine a fact in issue." Obviously, Rule 403 of the Federal Rules of Evidence requires that the evidence may be excluded if its relevance is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

## THE EXPERT REPORT

Rule 26 of the Federal Rules of Civil Procedure require a report which must contain:

(1)     a complete statement of all opinions the witness will express and the basis and reasons for them;

(2)     the facts or data considered by the witness informing them;

(3)     any exhibits that will be used to summarize or support them;

(4)     the witnesses qualifications, including a list of all publications authored in the previous 10 years;

(5)     a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(6)     a statement of the compensation to be paid for the study and testimony in the case.

The expert report must contain a complete statement of all opinions and the basis and reasons therefore, and must not be sketchy, vague or preliminary in nature. *See Dyett v. North Broward Hosp. District*, 2004 WL 53220630, *1 (S.D. Fla. Jan. 1, 2004). A preliminary report does not suffice under Rule 26. *Hallmark Developers, Inc. v. Fulton County, Georgia*, 2004 WL 5492706, *6 (N.D. Ga. September 27, 2004). One of the required pieces of information in the report is the list of cases in which the witnesses testified as an expert at trial or by deposition in the previous four years. Fed.R.Civ.P. 26(a)(2)(B)(v). "This list of cases must at a minimum include the name of the court or administrative agency where the expert previously testified, the names of the parties, the

case number, and whether the testimony was provided at trial or at a deposition. *Anderson v. Caldwell County Sheriff's Office*, 2011 WL 2418509 *1 (W.D.N.C. June 13, 2011); citing *Coleman v. Dydula*, 190 F.R.D. 316,318 (W.D.N.C. 1999); *Hilt v. SFC, Inc*., 170 F.R.D. 182, 185 (D. Kan. 1997); *Elgas v. Colorado Belle Corp*., 179 F.R.D. 296, 300 (D. Nev. 1998), "The obvious purpose of providing lists of prior cases is to enable opposing counsel to obtain prior testimony of the expert." *Coleman*, 190 F.R.D. at 318. See also *Sullivan v. Glock, Inc*., 175 F.R.D. 497, 503 (D. MD. 1997).

## RELEVANT DEADLINES

Under the Court's Scheduling Order entered on August 7, 2012 [Doc. 10], the parties were required to comply with the following relevant deadlines:

| | |
|---|---|
| Plaintiff to file a final list of expert witness(es) in chief and submit expert reports to defendant by | 01/20/13 (Sun) |
| | |
| Plaintiff to file a final list of witnesses, together with addresses and brief summary of expected testimony where a witness has not already been deposed, by | 02/10/13 (Sun) |
| | |
| Plaintiff to file a final exhibit list by | 02/10/13 (Sun) |
| | |
| Defendant to file a final list of expert witness(es) in chief and submit expert reports to Plaintiff 21 days thereafter. | 02/10/13 (Sun) |
| | |
| Defendant to file objections to Plaintiff's final exhibit list, under Fed.R.Civ.P. 26(a)(3)(B), 14 days thereafter | 02/24/13 (Sun) |
| | |
| | |

## THE IRMITER/JOHNSON EXPERT DISCLOSURES

Plaintiff disclosed Mr. Irmiter and Mr. Johnson as experts and filed their reports and supporting information on January 21, 2013.  For convenience sake, the documents filed by the Plaintiff with regard to Mr. Irmiter and Mr. Johnson are attached hereto. (Exhibit 1).  They include a Curriculum Vitae of Mr. Irmiter, a Curriculum Vitae for Mr. Johnson (which includes Mr. Johnson's list of testimony), a separate list of "Testimony, Deposition and Arbitration Experience" for Mr. Irmiter, a rate schedule dated January 21, 2012 for Forensic Building Science, a "Storm Damage Report," a repair estimate, and numerous photographs.  The "Storm Damage Report" is digitally signed by both Mr. Irmiter and Mr. Johnson.  Mr. Johnson, a professional engineer, stamped the first page of the report.  For some reason, the word "UNVERIFIED" is written across the engineering seal.  In general, the report discusses some background information and repair estimates that had been reviewed, and then begins discussing the observations made during the site inspection.  The only personnel listed from Forensic Building Science as having visited the property were Gregory Crawford and Ashley Olson.  They note that, according to the Oklahoma County Assessor's website, the building is 22,689 square feet.  The roofing material found by the inspection was, "a 4-ply of built-up roofing with an aluminum coating."

The experts' conclusions are contained in Section 3.0 of the report.  Section 3.1 reads as follows:

> The majority of the damage to the building's interior walls, ceilings, and flooring materials is consistent with a catastrophic failure of the roof membrane, curb flashing,

flashing movement and sealant compromise.  Reglet flashing in one area appears torn by wind at the transition from flat roof termination to brick parapet.  We consider this area subject to localized wind effects and consider the damage consistent with wind.  Hail damage to the membrane is noted as well.  Such damage is not always discovered immediately as it will take rain to demonstrate the breaches in the roof and may be delayed by materials between the compromised roof membrane and the interior finishes. (i.e. ceiling tile).  In addition, water evaporation zones on the roof which were not previously damaged would be natural entry points for extensive water intrusion after the storm.

Significantly, Section 3.2 states, *"The complete scope of the damage cannot be finalized without further destructive investigation."* (emphasis added).  The report further notes under Section 3.6 that the "IECC was in place at the time of the loss," and therefore, repairs will have to comply with the relevant energy codes.  (The report does not actually define what the IECC is, but it appears to be the International Energy Code Council).

The scope of repairs contained in Section 5.0 of the report states that the roof will need to be totally removed and replaced, as will any wet decking and any wet insulation, that the roof metals need to be replaced, that roof plans must be "sealed by a licensed architect or engineer," that new insulation will have to be installed "per Architect's sealed drawings to meet code," that a civil or structural engineer of record will verify compliance with "ASCE 7-05," and that a "sealed architectural drawing is required to replace the water damaged ceiling tile."

At the bottom of the expert report, Mr. Irmiter and Mr. Johnson include the following statement:

> **Discovery is ongoing.  Additional testing and inspections may need to be performed and additional and/or supplemental information and opinions may be contained in future reports issued by Forensic Building Science, Inc.**

(emphasis added).

### MR. IRMITER'S LIST OF OTHER CASES IN WHICH HE HAS TESTIFIED BY DEPOSITION OR AT TRIAL OVER THE PAST FOUR YEARS

The Expert Disclosures were filed on January 21, 2013.  Mr. Irmiter provides a list of testimony at district court trials, testimony at arbitrations, first party appraisals in which he served as either an appraisal or umpire, and then he listed cases in which he gave "depositions and or affidavits filed in courts."  The list of testimony at district court trials extends much longer than four years, but the one case in which he has provided trial testimony in the past four years is listed as "Gunnerson (2011) Wright County, Minnesota."  The list of cases in which he has testified by deposition also goes back much longer than is necessary, but it includes cases in which he has given depositions "and or affidavits."  This is improper, because it shifts the burden to opposing counsel to determine whether he gave a deposition or an affidavit in the listed cases.  On the list, there are 16 cases which appear to fall within the required time period.  The following is the amount of detail provided by the expert with regard to these cases:

| | |
|---|---|
| 32. | Creekwood Estates (2006 – 2009) |
| 33. | Creekwood v. Lloyds of London, Federal Court (2011) |
| 34. | Swenson (South Dakota) 2011 |
| 35. | Krohn vs. Minks Custom Homes, Inc., et al., Washington County, MN (2011) |
| 36. | Friedberg vs. Chubb & Sons, Inc., et al., Federal Court (2011) |
| 37. | Tamarind vs. Mid-Century Insurance Co., Federal Court (2011) |
| 38. | Emmanuel Tabernacle (OK) 2012 |
| 39. | Country Land/Werner Investments (C)) 2012 |
| 40. | Kevin McGlothlen (CO) 2012 |

| 41. | Windsor Court (CO) 2012 |
|-----|-------------------------|
| 42. | Advanced Auto Body (CO) 2012 |
| 43. | Daniel Clark (CO) 2012 |
| 44. | Bethany Medical Clinic (OK) 2012 |
| 45. | Greater Mount Carmel Baptist Church (OK) 2012 |
| 46. | New Bethel Baptist Church (OK) 2012 |
| 47. | Internet Physicians (TX) 2012 |
|     |  |
|     | Updated 8-24-12 |

After receiving this inadequate list, counsel for State Farm emailed counsel for the Plaintiff and pointed out the list failed to comply with the requirements of Rule 26, and asked for revised information. (Exhibit 2). Furthermore, the list said it ended in 2012, so it failed to include any depositions given from that date to the date the report was filed with this Court.

## THE ESTIMATE

Plaintiff's experts prepared a 16 pages estimate for damages to the building, with a total damage figure of $557,566.08. Included within the estimate is $7,700.00 for a building permit, $10,000 for "contingency for unknown conditions due to age of structure," and amounts for removing and replacing over 27,000 square feet of 4-ply built-up roof and painting it with aluminum UV coating. It also includes over $71,000 for "install 2 ISO insulation board." Finally, it includes replacing every single ceiling tile in any room where any of the ceiling tiles have had water damage. In other words, if a room has 20 ceiling tiles and one is damaged, the estimate includes replacing all 20. The estimate includes general contractor's overhead and profit, and this is calculated as 21% of the total cost of the project. Also attached to the report are 29 "infrared inspection photos." There is no mention of the infrared examination in the experts' report, and the

photo captions merely say, "anomaly detected" without explaining anything at all about what is being detected, why it is an anomaly, and how the infrared photography determines the anomaly.

## DEFENDANT'S EXPERT REPORTS

On February 11, 2013 Defendant filed its experts' reports.  In the report by Defendant's expert Pat Heil (Exhibit 3), he noted that he had examined the property on September 11, 2012.  He says that he conducted a "hands and knees" examination of this particular roof, looking at many marks on the roof surface, and after careful examination and feeling the roof surface with his fingers, he concluded there was no hail impact damage to the roof surface.  He also noted that when he was conducting his examination, he asked to take core samples from the roof, which would enable him to run laboratory tests on the mat of the roof surface to determine whether there was any hail impact damage.  This request was denied.  Mr. Heil also notes the roof surface is a single ply, modified bitumen roof, not a 4-ply built-up roof with an aluminum coating.

Michael Berryman, an expert for State Farm, also noted that the roof was a single ply, modified bitumen roof, and not a 4-ply built-up roof with aluminum coating. (Exhibit 4).  He also indicated that he had referenced a service from Eagle View Technologies to determine that the square footage utilized in Mr. Irmiter's and Mr. Johnson's estimate for the roof was approximately 20% too high.  Accordingly, all of their costs for roofing materials were inaccurate.  Mr. Berryman also noted that he had checked with the Chief Building Inspector and Code Enforcement Official for the City of Bethany, who told him the building permit fee would only be $29.40, and that the City of

Bethany had not adopted the IECC.  Mr. Berryman also questioned the unit pricing utilized by Mr. Irmiter and Mr. Johnson in their estimate because the estimate did not list any type of price list, and the unit prices seemed excessive based on Mr. Berryman's experience as a general contractor in Oklahoma City.

## THE CORE SAMPLING

On December 26, 2012 State Farm noticed the deposition of Thomas Irmiter and Brian Johnson to take place on February 28, 2013, in St. Paul, Minnesota.  On February 15, 2013, counsel for Plaintiff sent counsel for State Farm a letter notifying him that destructive testing in the form of core sampling would be taking place on Plaintiff's roof on February 19, 2013.  State Farm was invited to have its expert attend the core sampling, and Plaintiff warned that, "if you and/or your experts opt not to attend, you assume the risk of spoliation and waive any arguments related thereto."  At Plaintiff's invitation, Michael Berryman attended the core sampling.  Brian Johnson attended on behalf of the Plaintiff.

## THE REVISED REPORT, REVISED ESTIMATE AND REVISED LIST OF CASES

Mr. Irmiter is serving as an expert witness for Plaintiff's counsel on five cases pending in Oklahoma City against State Farm.  His deposition was noticed in all five cases to take place in St. Paul, Minnesota, on February 26, 27 and 28, 2013.  During the course of his first deposition, Mr. Irmiter admitted that he had testified in other cases since August of 2012, and said he had updated his list of cases and had the updated list sent to the court reporting firm.  The new list added three cases which had not been

disclosed in the earlier list.  It also deleted the "Internet Physicians" case which had been on the previous list.  It did provide some additional information about the cases, but many of the cases were still missing the name of the defendant, and some were missing the name of the court in which the action was pending.  It also added one case in which Mr. Irmiter had testified in trial.  Finally, the list noted that it had been updated January 18, 2013, which was three days before the Plaintiff filed the expert designations in this case.

The deposition in the case at hand was scheduled to begin at 9:00 a.m. on February 28, 2013, and the parties agreed to move the start time to 8:00 a.m. to accommodate the attorneys' flight schedules.  At approximately 5:20 p.m. on the night before the deposition in this case, State Farm's counsel received a call from the front desk at the hotel at which he was staying informing him that a notebook had been delivered to the front desk.  Shortly thereafter, counsel received an email from the office manager for Forensic Building Science forwarding a revised estimate for repairs to the Plaintiff's building.  The office manager instructed counsel to print a copy of the estimate and bring it with him to the deposition.  Counsel replied by email that he had no way to print the estimate and asked the witness to bring an extra copy of the estimate to the deposition the next morning.  Counsel picked up the notebook, which contained the Supplemental Report, at 6:00 p.m.  The deposition took place as scheduled, but counsel for State Farm noted on the record at the beginning of the deposition that by taking the deposition of Mr. Irmiter, State Farm was not waiving its rights to object to the supplemental information and was reserving its rights to seek appropriate relief, including sanctions and seeking to strike the witnesses.  Mr. Johnson's deposition was scheduled to take place that

afternoon, but to cover the original report and original estimate, as well as the supplemental report and revised estimate took even longer than anticipated, so Mr. Johnson's deposition has not taken place.

## THE TESTIMONY OF TOM IRMITER

Mr. Irmiter was deposed only the day before this motion is being filed, and the transcript is not yet available. The Defendant will supplement this Motion to Strike with the deposition testimony so that the actual testimony becomes a part of the record.

Mr. Irmiter testified that his opinions could not be completed until there was core sampling taken at Dr. Brant's building. This is what he was referring to Section 3.2 of the original report when it stated that "the complete scope of damage cannot be finalized without further destructive investigation." When he was contacted by Plaintiff's counsel about his deposition being taken, he decided that the core sampling had to be conducted. Mr. Johnson was assigned the task to attend the core sampling, make observations, take moisture readings, and prepare the observations for the Supplemental Report. The Supplemental Report was dated February 26, 2013, but not provided to counsel for State Farm until after 5:00 p.m. on February 27, 2013. The revised estimate (Exhibit 5) totaled approximately $771,000, roughly a 27% increase over the prior estimate. The estimate continued to include pricing for removing and replacing a 4-ply built-up roof with aluminum coating, but now it was only 22,000 square feet of roofing. The revised estimate included replacing almost all of the Plaintiff's air conditioning condensers on the roof, at a cost of $60,000.00. Mr. Irmiter testified that it was Mr. Johnson's decision that

all of the air conditioners needed to be replaced, although no basis for that decision is set forth in the original or supplemental report.

## ANALYSIS OF THE RELIABILITY OF THE EXPERTS' OPINIONS IN THE ORIGINAL REPORT AND ESTIMATE

Mr. Irmiter and Mr. Johnson have been asked to determine whether Plaintiff's roof was damaged as a result of the May 16, 2010 hail storm and if so, what is the appropriate repair method to address the damage caused by that storm. Hail damage to the roof surface would generally be covered under the policy, but water damage to the interior would be excluded unless the storm caused an opening through which water was able to enter the building. According to the information in the report, Mr. Irmiter and Mr. Johnson reached their conclusions in the original report without having ever visited the Plaintiff's building. This means that they did not personally observe or feel the roof surface to try to determine whether there was hail damage. In that case, their opinions would only be based upon the information provided to them by Gregory Crawford and Ashley Olson who conducted the field inspection, as well as a review of the photographs. Photographs of marks on a modified bitumen roof would not provided enough information for one to accurately determine whether there is hail damage to that roof surface. Hail can scuff the oxidation off the surface of the roof without causing any actual damage. Simply because there is a mark or discoloration does not equate to hail impact damage. Therefore, these experts must be relying upon Gregory Crawford's opinions as to what was and was not hail damage. There is no indication or information regarding Mr. Crawford's background, education, training, or experience in identifying

hail damage to modified bitumen roofs.  Furthermore, Mr. Crawford has never been listed as a person with knowledge of relevant facts, nor has he been listed as an expert who gave an opinion upon which the testifying experts are relying.  Based on the report, it is Mr. Crawford who has made the determination as to where the hail damage is, not Mr. Irmiter and not Mr. Johnson.

There are a good number of photographs produced as part of the experts' report which have a number of blemishes circled.  According to Mr. Irmiter, Mr. Crawford circled areas where hail may have impacted the roof without causing damage to the roof mat.  Plaintiff has provided no field notes to indicate which marks were simply cosmetic and which marks are actual damage.

Furthermore, although the original report talks about a catastrophic failure of the roof, it does not indicate that the catastrophic failure was due to the May 16, 2010 hail storm.  The experts opine that there is wind damage to flashing on Plaintiff's roof.  As the Court is well aware, there are many, many windy days in Oklahoma City.  Mr. Irmiter testified that without consulting with a meteorologist, he could not begin to give an opinion regarding the actual wind speeds at Plaintiff's building on May 16, 2010 (and there has been no consultation with a meteorologist).  Furthermore, nowhere in the report do Mr. Irmiter or Mr. Johnson address where the opening has occurred that permitted water to enter Plaintiff's building and cause the interior damage.

The basic points of estimating construction repairs are determining (1) what is needed to effectuate the repair, (2) how much of a certain material is needed for that repair, and (3) how much is that particular work going to cost.  Mr. Irmiter and Mr.

Johnson have proved unreliable on all three areas.  In Mr. Irmiter's deposition, he insisted that the roof measurements taken by Greg Crawford, were absolutely and unquestionably accurate.  Mr. Irmiter explained that the roof surface was over 27,000 square feet based on Mr. Crawford's calculations.  When counsel for State Farm pointed out that Eagle View Technologies had said the roof measured 22,793 square feet, Mr. Irmiter responded that Eagle View is not always accurate, especially with regard to flat roofs.  Counsel also pointed out that another roofer had measured the roof at approximately 22,000 square feet, and Mr. Irmiter dismissed this as being inaccurate.  Counsel also showed Mr. Irmiter where his own report said the county showed the building as having 22,689 square feet, and he again dismissed the accuracy of the county's number.  Later in the deposition when looking at the revised estimate prepared by Mr. Crawford and supposedly reviewed by Mr. Irmiter, it showed a square footage on one particular section of roof as being significantly less than the original estimate by Forensic Building Science.  Mr. Irmiter explained that Mr. Crawford had recalculated the square footages as part of preparing the revised estimate and had caught his earlier error.  The error in the original estimate is about 20% too much for the roof square footage.

Both the original estimate and the revised estimate include the wrong type of roof on Dr. Brant's building.  As noted by Mr. Berryman and Mr. Heil, the top surface of this roof was actually a single ply, modified bitumen roof.  So not only does the estimate have the quantity wrong, it is inaccurate as to the actual product on the roof as well.  The estimate also provides for aluminum coating, which the existing roof does not have.  A building construction estimator who cannot determine even the most basic points of

product identification is clearly does not meet the standards of reliability under *Daubert*. Again, Mr. Irmiter appears to be relying upon Gregory Crawford to make that determination, and Mr. Crawford does not seem to be qualified to accurate do that.  Mr. Irmiter admitted in his deposition that the top surface of the roof was a modified bitumen roof, and not a built-up roof.

Finally, the original estimate has grossly over-inflated prices for the building permit, installing two inch ISO board, and includes more than the standard percentage for general contractor's overhead and profit.  The original estimate also includes $10,000 for unknown contingencies.  Mr. Irmiter testified that the two inch ISO board, which is not present in the Plaintiff's roof, should be the insulation used because it is required under the IECC.  Mr. Irmiter claims that the City of Bethany has adopted the IECC.  This is contrary to the information provided to Mr. Berryman by Leon Christian, the Chief Building Inspector and Code Enforcement Official for the City of Bethany.  Additionally, the attached information from the City of Bethany does not indicate that they have adopted the IECC. (Exhibit 6).  Mr. Irmiter testified that Mr. Johnson had spoken to someone with the City of Bethany about the building codes.  The report does not indicate that any such conversation took place, nor have the experts provided the name of any person with whom they supposedly spoke at the City of Bethany.

The report by Mr. Irmiter and Mr. Johnson is full of broad statements regarding requirements for approvals by engineers or architects in reference to "code" without giving any basis for those statements.  If an applicable building code adopted by the City of Bethany, in fact, requires an architect or an engineer to approve some aspect of the

repair job which they believe is necessary at Plaintiff's building, they should have referenced the specific code. By making such vague references in both the report and in Mr. Irmiter's deposition, the Defendant is forced to almost prove a negative by searching through every applicable code and determining whether they do or do not support the contentions of the expert. Otherwise it is the "ipse dixit" of the expert.

Finally, it should be noted that the witnesses qualifications which must be included with the report do not establish that either Mr. Irmiter or Mr. Johnson is qualified to opine as to hail damage to a commercial modified bitumen roof. According to his C.V., Mr. Irmiter is an expert at water intrusion behind walls, evaluation of building codes, product specifications, construction disputes, pre-sale home inspections, fenestration testing and deconstruction, mold, soot, lead and asbestos sampling, and "inspection on first-party losses including fire, wind, hail, ice dams, tornados and floods." His resume does not indicate any type of formal training or seminars regarding the identification of hail damage to modified bitumen roofing. The only such experience listed in Mr. Johnson's resume is that he attended a course put on by Haag Engineering, which is a four day course followed by a brief examination. None of the information provided suggests a level of expertise gained through education or real world experience that would qualify either one to testify regarding the identification of hail damage to the modified bitumen roof owned by Plaintiff.

## THE "SUPPLEMENTAL REPORT"

The Supplemental Report (Exhibit 7) is actually 11 pages, as compared to the 8 page original report prepared by Mr. Irmiter and Mr. Johnson. Again it is digitally signed

by Mr. Irmiter and has the same type of stamp from Mr. Johnson.  It is not simply limited to observations made as a result of the core sample.  Mr. Johnson had never been to the site before, so he took the opportunity to review the exterior and interior and make his own notes regarding damage he observed.  He also noted there was a 2012 storm event (presumably the May 29, 2012 hail storm at which deposited large hailstones throughout the Oklahoma City metropolitan area).  The report includes revisions to the prior report and additional observations about the exterior and interior damage.  The Supplemental Report also includes the following language:

> **Discovery is ongoing.  Additional testing and inspections may need to be performed and additional and/or supplemental information and opinions may be contained in future reports issued by Forensic Building Science, Inc.**

### SANCTIONS

In addition to being unreliable, the testimony of both Mr. Irmiter and Mr. Johnson should be excluded as a sanction to the Plaintiff.  The Plaintiff had an obligation to provide a complete report from his experts by the expert witness deadline.  If some information was missing or could not be obtained at the time the report was due, this should have been noted at the time the reports were filed, and certainly the duty to supplement under Rule 26 requires that all supplementations be made by the time the pretrial disclosures are due.  Fed. R. Civ. P. 26(e)(2).  The Plaintiff's final witness and exhibit list was due on February 10, 2013, and State Farm would submit that that was the deadline for Plaintiff to supplement any missing information.  The taking of the core sample, which is at least arguably the basis for the Supplemental Report and

supplemental estimate, is something the experts could have done during the original inspection in March of 2012.   Again, core sampling was requested by Pat Heil, the Defendant's expert, and this request was denied.  Not until Mr. Irmiter's deposition was requested did Mr. Irmiter decide that they needed to go forward with the core testing.  The core testing should have been done long before the expert witness deadline, so that information could have been timely provided to the Defendant.   Under the Rules of Civil Procedure, the Defendant should have the opportunity to permit its experts to review all information from the Plaintiff's experts and address such information in forming their own opinions.  Instead, the information in the form of the Supplemental Report and the brand new estimate were not given to State Farm's counsel until less than 15 hours before the deposition of Mr. Irmiter began (even though the report was dated the day before that).   State Farm's counsel did not have the opportunity to adequately prepare to examine Mr. Irmiter on the basis of this new information.   One other piece of new information contained in the supplemental report was that Mr. Irmiter himself had visited the Plaintiff's building in August of 2012 and, he admitted in his deposition that he relied upon this inspection in forming his opinions relative to the original report.   This information should have been disclosed by Mr. Irmiter in the original report, but was not.  Additionally, State Farm was prejudiced by its inability to have its experts review the additional information and assist counsel in preparing for Mr. Irmiter's deposition.  There were also three pages of notes and measurements which were made by Gregory Crawford back in March of 2012 which were not included in Forensic Building Science's response

to Defendant's subpoena duces tecum, as well as numerous new photographs and these were finally produced the night before Mr. Irmiter's deposition.

The list of cases in which Mr. Irmiter has testified by deposition and trial filed with this Court by the expert witness deadline was wholly inadequate.  It failed to provide enough information to permit the Defendant to obtain copies of either deposition or trial testimony given by Mr. Irmiter.  Furthermore, it was inaccurate as it missed one trial and three depositions given by Mr. Irmiter in the four years before the report was filed.  It was also inaccurate because it included the "Bethany Medical Clinic" case, and Mr. Irmiter was not actually deposed in that case until February 28, 2013.

## RELIEF REQUESTED

State Farm seeks to have both Mr. Irmiter and Mr. Johnson's testimony excluded in this matter.  What seems to have happened is that they hurriedly issued a report which was based primarily on the observations of Gregory Crawford.  They noted it was a preliminary report and that further testing would need to be done to complete their opinions.  Apparently in Minnesota state court, where Mr. Irmiter has given most of his depositions, an expert report is not quite as important and final as in federal court.  As this Court has previously noted, an expert's report should be so complete that a party would know the causes of all of the expert's opinions without taking that expert's deposition.  Instead, Mr. Irmiter and Mr. Johnson had not actually completed their opinions, and once their depositions were noticed, they sprung into action to get the core sample done.  Even though the core sample has nothing to do with the air conditioning, they have now added over $60,000 to their estimate to replace 18 air conditioning

condensers on Plaintiff's roof.  Based on the language in the Supplemental Report, Mr. Irmiter and Mr. Johnson are apparently under the impression that they can simply revise or supplement their opinions further before trial.

At an absolute minimum, Plaintiff's Supplement Report and revised estimate must be excluded.  Certainly, in that environment, the opinions of Mr. Irmiter and Mr. Johnson are admittedly inaccurate and unreliable.  They now admit that their original estimate includes the wrong roof surface.  They now admit that their original estimate has the wrong square footage for the roof surface.  Furthermore, Mr. Irmiter did not disclose in the original report that he did rely on his own site inspection at Plaintiff's premises, but the Supplemental Report notes that he did visit the premises and that Mr. Johnson has now visited the premises.

Under the circumstances, the appropriate remedy is to exclude the testimony of both Mr. Irmiter and Mr. Johnson in this case.  Although Mr. Irmiter and Mr. Johnson are not charged with knowledge of the Federal Rules of Civil Procedure, Plaintiff's counsel certainly is and had an obligation to make the witnesses aware of their obligations under the federal rules to provide a complete and final report containing all of their opinions and the basis and reasons for them, the facts or data considered by the witness in forming those opinions, the exhibits that will be used to summarize or support them, as well as a list of the cases during the previous four years in which the witness has testified as an expert at trial or by deposition.  This has simply not been done in this case.  Under Fed.R.Civ.P. 37(c) if a party fails to provide information required by Rule 26(a), the party is not allowed to use that information or witness to supply evidence at trial unless

the failure was substantially justified or is harmless.   In this case, the failure is not substantially justified nor is it harmless.   Additionally, Defendant is entitled an award of attorney's fees and expenses related to the taking of Mr. Irmiter's deposition and the filing of this motion.

## SUMMARY

The Rules of Civil Procedure have been trampled upon by the Plaintiff in this case.  Mr. Crawford should have been disclosed as a person with knowledge of relevant facts as well as an expert whose opinion was relied upon by the testifying experts.  The expert report completed by Mr. Irmiter and Mr. Johnson does not meet the requirements of Rule 26(a).  The deadline for expert reports was a firm deadline, and not simply a starting point for the experts to begin more detailed examination of their notes and data.  They did not simply correct a math error, they are attempting a complete "do over."  Documents which should have been produced weeks earlier are produced hours before the expert's deposition.   Under Rule 37, the appropriate remedy is to exclude the testimony of Mr. Irmiter and Mr. Johnson as a sanction.  In addition, the witnesses are not qualified to give the opinions asserted in their report and estimate, and further, the opinions contained in their report and estimate are unreliable and inadmissible.

Defendant prays that the testimony of Mr. Irmiter and Mr. Johnson be excluded in this case and the Defendant be awarded sanctions in the amount of $4,500.00 representing attorney's fees incurred for preparing for and taking Mr. Irmiter's deposition and preparing this motion for sanctions and including $2,000.00 for Mr. Irmiter's fee for

giving the deposition.   In the alternative, the Defendant prays for any relief deemed

appropriate by this Court.

Respectfully submitted,


By___/s/Daniel C. Andrews_____
        Daniel C. Andrews, OBA #19392
JONES, ANDREWS & ORTIZ, P.C.
21 E. Main St., Suite 101
Oklahoma City, Oklahoma  73104
Telephone:   (405) 601-8713
Facsimile:   (405) 232-8330

**ATTORNEYS IN CHARGE FOR
DEFENDANT STATE FARM FIRE AND
CASUALTY COMPANY**


## CERTIFICATE OF SERVICE

I hereby certify that on March 1st, 2013, I electronically transmitted the attached
document to the Clerk of the Court using the ECF System for filing and transmittal of a
Notice of Electronic Filing to the following ECF registrants:

Mr. David A. Christoffel
ARGUELLO, HOPE & ASSOCIATES, PLLC
1110 Nasa Parkway, Suite 620
Houston, Texas 77058

John B. Ward, OBA# 20124
816 NW 53rd Street
Oklahoma City, OK 73118

/s/ Daniel C. Andrews_____
Daniel C. Andrews